James COWAN, Andrew McMahan, Timothy Harper, and Patricia Morton, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

TREETOP ENTERPRISES, INC., individually and doing business as "Waffle House," James L Shaub, II, and Billy Ezell, Defendants.

No. 3:98–CV–0623.

United States District Court,
M.D. Tennessee,
Nashville Division.

Aug. 16, 2001.

Trevor Wayne Howell, R. Scott Jackson, Jr., Howell & Jackson, PLLC, Nasville, TN, for Plaintiffs.

Hugh C. Howser, Jr., Charles Eric Stevens, Kara E. Shea, Miller & Martin, LLP, Nashville, TN, for Defendants.

## MEMORANDUM

HAYNES, District Judge.

Plaintiffs, James Cowan, Andrew McMahan, Timothy Harper and Patricia Morton, filed this action under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b), on behalf of themselves and all others similarly situated, against the Defendants: Treetop Enterprises, Inc., their current or former employer; James L. Shaub, II, and William E. Ezell, III, officers and stockholders of Treetop. Plaintiffs allege, in essence, that as current or former unit managers at Treetop's restaurants, the Defendants deemed them *bona fide* executive employees who are exempt from FLSA's overtime pay requirements. The Plaintiffs assert that in actuality, the primary duty of the unit manager is working as a grill operator or cook on the first shift and that, in fact, unit managers are regular employees who are entitled to overtime for the substantial number of hours worked. Plaintiffs each worked beyond FLSA's forty hour limit without compensation. After this action was filed, other current and former unit managers joined as Plaintiffs.

In earlier proceedings, the Honorable Thomas A. Higgins, District Judge granted the plaintiffs' motion for partial summary judgment (Docket Entry No. 168) and denied the defendants' motion for summary judgment (Docket Entry No. 174). In sum, Judge Higgins concluded that Plaintiffs were not *bona fide* executives and in fact worked as cooks who are entitled to overtime compensation. (Docket Entry No. 212). Judge Higgins, however found that the Defendant Shaub could not be held liable for these violations and that the Defendants' good faith barred liquidated damages and limited Plaintiffs' recoveries to the two-year period before filing suit. The Court granted the plaintiffs' motion to strike defendants' expert report (Docket Entry No. 180) and the defendants' motion to supplement the record. (Docket Entry No. 201).

The Defendants Treetop and Ezell moved to reconsider, arguing that the Court erred in finding the lack of material factual disputes and that the Treetop unit managers and district relief managers are not exempt executives under the FLSA. In support of their motion, the defendants submitted additional evidence to demonstrate the material factual disputes and the Courts errors.

In opposition, Plaintiffs contended that the Defendants' evidence was from the witnesses who were not disclosed during discovery despite Plaintiffs' specific requests for the identities of the persons

upon whom the Defendants relied for their FLSA exemption defense. The Plaintiffs also moved to strike this evidence from witnesses who were not disclosed during prior discovery.

The Court denied the Defendants' motion to reconsider, but granted the Plaintiffs' motion to strike (Docket Entry No. 236).

The Defendants also moved to decertify this action as a collective action and correctly noted that the Court had only provisionally nominated this action as a representative action (Docket Entry No. 71) and that such a determination can be revisited once discovery is completed. *Yates v. Wal–Mart Stores, Inc.*, 58 F.Supp.2d 1217, 1218–19 (D.Colo.1999). Yet, based on Judge Higgins' findings of fact, the Court concluded that the Plaintiffs are similarly situated to allow this action to continue as a collective action. *Hoffmann–La Roche v. Sperling*, 493 U.S. 165, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989). The Court's earlier ruling considered the testimony of seventeen unit managers, several district managers, a division manager as well as other personnel, including the defendants' internal documents and policies describing the duties and responsibilities of the unit managers. Thus, the Court denied the Defendants' motion to decertify. (Docket Entry No. 251).

A bench trial was held on damage issues on June 18–20, 2001 and set forth below are the Court's findings of fact and conclusions of law.

## A. Findings of Fact[1]

Under a franchise agreement with Waffle House, Inc., Treetop owns and operates 103 Waffle House restaurants, some of which are in Tennessee, Alabama, Mississippi and Kentucky. Each restaurant unit is a separate facility of 1,750 square feet and seats approximately 33 to 46 customers. The restaurants have three shifts: 7:00 a.m. to 2:00 p.m., 2:00 p.m. to 9:00 p.m. and 9:00 p.m. to 7:00 a.m.; but the first shift is the busiest and most profitable and yields 50 percent of all sales in the restaurants. Defendants' Waffle House restaurants are open 24–hours a day, 365 days a year.

Under its organizational structure, Treetop assigns a unit manager to each restaurant. Each unit manager is supported by a district relief manager who substitutes for the unit manager on the unit manager's days off. The parties agree that the duties and responsibilities of unit managers and district relief managers are identical. The unit managers report directly to a district manager who usually has responsibility for three restaurant units in a defined geographical area. Treetop currently has 30 district managers who supervise unit managers and workers in the restaurants.

A district manager reports to a division manager who has responsibility for nine restaurants generally in three districts. Treetop currently has twelve division managers. A division manager, in turn, reports to a regional manager, who generally has responsibility for 25 to 30 restaurants in a defined geographical area. However, currently Treetop has only one regional manager who is responsible for 15 restaurants, and the remaining restaurants do not have regional managers. The regional managers report to area managers who report directly to the president and chief operating officer of Treetop.

At some point in their employment with Treetop, the Plaintiffs worked or are currently working as unit managers and–or

---

1. The first position of this section on the Defendants' business is from Judge Higgins' earlier ruling. (Docket Entry No. 212 at pp. 2–6).

district relief managers. Treetop classified its unit managers and district relief managers as exempt "executives" under the FLSA. Each restaurant is staffed by 15 to 20 hourly employees who generally serve in two distinct categories, grill operators ("cooks") and sales persons ("waitresses").

In theory, Treetop considers its unit managers to be responsible for "organizing all resources necessary in servicing the customer and seeing that service actually happens as contemplated. The key ingredient to service is personnel." The unit manager's job description in *Waffle House Way*, an operational manual prepared and distributed to franchisees by Waffle House, reflects that the unit manager's job includes staffing as does the district manager's job. Yet, in practice, staffing is the district manager's job. The three main components of the position of district manager is sales, profit and people. Providing proper staffing plays a major role in sales and profit.

As to their individual restaurant activities, because the first shift is the busiest, the unit manager is usually the grill operator or cook for that shift. In fact, Treetop's "Production Training Unit" manual for unit manager trainees states

> The *primary objective* at the Production Training Unit *is to become a proficient grill operator.* A second objective is to gain exposure to the daily management duties and responsibilities....

Plaintiffs' notice (Docket Entry No. 172), Deposition Exhibit 117 at 2 (emphasis added).

Unit managers also wait on tables for absent waitresses. For other shifts, if an employee is absent, until a replacement employee arrives, the unit manager performs the functions of the absent employee's position.

A "very common" practice at Treetop restaurants is for hourly employees, who are cooks or grill operators on other shifts, to fill in for and perform the jobs of the unit manager when a unit manager is sick and the designated district relief manager is unavailable to cook. Plaintiffs' notice.

The Defendants do not maintain time records for unit managers as to scheduling time or the total hours these managers are at work. There is not any periodic survey or analysis of the amounts or percentages of time spent by unit managers on particular tasks. The only time analysis of the unit managers' actual activities on a weekly basis was provided by the plaintiffs who have worked in 31 different restaurants in 13 different cities/towns, and three different states.

It is undisputed that all of these Plaintiffs have performed the multiple employee tasks at the Treetop restaurants at issue, including waiting on tables. Based on the time analyses performed by the unit managers who submitted affidavits, Judge Higgins found that the average number of hours the unit managers worked per week while employed by Treetop ranged from 87.32 to 90.76 hours. Some unit managers sometimes worked "triple shifts," or 24 hours straight in the restaurants and sometimes slept in the restaurants.

At the evidentiary hearing on damages, the parties stipulated two facts:

1. The average weekly compensation applicable to each of the Plaintiffs in this lawsuit for the purpose of calculating damages is $579 per week; and

2. The total number of weeks of employment of all of the Plaintiffs during the applicable recovery period for the purpose of calculating damages is 4,321 weeks.

Joint Exhibit 1, Stipulations of Fact.

In their Answer to the Amended Complaint, Defendants also admitted that unit

managers worked in excess of 40 hours per week and were not paid overtime wages for these hours. (Docket Entry No. 276 at p. 241; Defendants' Answer to Amended Complaint at ¶ 32). In their response to Plaintiffs' First Request for Production of Documents, Defendants admitted that they did not keep any records of the number of hours worked by the Plaintiffs. *Id.*, p. 242.

Accordingly, the only issue is the amount of overtime backpay owed by Defendants for each of the 4,321 weeks worked by Plaintiffs during the applicable recovery period. The resolution of this issue requires a finding of the average number of hours worked per week applicable to the Plaintiff class, and other factual findings necessary for the proper determination of the regular and overtime rates and the calculation of overtime backpay.

Plaintiffs' proof included the testimony of Plaintiffs: Robert Parsons, Steve Artley, Stanley Waterson, Marlin Lefever, Marc Cooper, Timothy Harper, Debra Dougherty, Jason Solano, Patricia Morton, and Domingo Meza. Each was a unit manager and worked at approximately twenty-one (21) different Waffle House restaurants during the applicable period. Treetop operated approximately 85 restaurants during this period and Plaintiffs' proof encompasses unit managers from approximately 25% of Defendant's restaurants.

The Plaintiffs' testimony was uniform that upon being hired as a unit manager at Waffle House, each was told that his or her work schedule would be 10 hours a day on a weekly schedule of six days on and two days off. The Defendant's "UNIT MANAGER DAILY SCHEDULE" also describes the 10–hour day, as well as the various duties to be performed from 6:00 a.m. to 3:00 p.m. and from 8:30 p.m. to 9:30 p.m. Plaintiffs' Exhibit 1. This schedule was posted in the office and–or on the bulletin board in various Waffle House restaurants. A Treetop memorandum states that it is "Treetop's policy and will always be the policy that no member of management will ever schedule themselves to cook/work doubles." Plaintiffs' Exhibit 4. As to compensation, as unit managers, Plaintiffs would be paid a salary plus certain bonuses. (Docket Entry No. 277, Transcript at pp. 27, 95–96). All Plaintiffs accepted the work schedule and pay for their unit manager positions.

The Court finds that Plaintiffs had an express agreement with Defendant when they took the position of unit manager that they would be required to work 10 hours a day, six days on and two days off.

Plaintiffs' actual performance of their duties and responsibilities consistently required Plaintiffs to work more hours than the 10–hours schedule. Aside from double shifts discussed later, Plaintiffs generally worked about 12 hours a day, with an additional three hours on Friday evenings in order to "supervise supper," a high volume time period at Waffle House restaurants. Without double shifts, the Plaintiffs generally worked 75 hours a week during a six day week (6 × 12 = 72, plus 3 additional hours for Friday night supper). The Plaintiffs were also required to work on all major holidays, including Christmas Eve, Christmas, Easter, and Thanksgiving. See, Plaintiffs' Exhibit 2. If their scheduled days off fell on a holiday, they were required to work those days.

On five day weeks, each of the Plaintiffs also worked double shifts, the first and second or the second and third shifts in addition to their regular duties. This need to work double shifts arose from persistent understaffing of hourly cooks and/or waitresses who failed to report for their scheduled shifts. In his affidavit, Defendant Billy Ezell, the majority owner and Tree-

tops' chief executive officer described this problems as follows:

> Because of the high turnover in employees, the unit manager is faced many times on a daily basis with staffing and personnel problems. If someone does not appear on a shift when scheduled, then it is the unit manager's responsibility, and he or she has the authority to call other employees or other unit managers to seek relief employees. He or she can also call the district manager and upper management for assistance in finding employees, but in the event no other employees are available, the unit manager fills in and works until such time as a substitute can be found to take their place.

(Docket Entry No. 276, Transcript at pp. 242–43).

Among the Defendants' internal documents, is "The Waffle Times" publication, instructing management to call the company's hotline to obtain staffing assistance where the unit manager is faced with working double shifts. Plaintiffs' Exhibit 3. Other evidence of serious understaffing is reflected in an October 15, 1997 memorandum from James Hutto, citing Treetops' purported policy that management should not schedule unit managers to work double shifts, and to exhaust every means to cover the shifts before a unit manager worked a double shift. Plaintiffs' Exhibit No. 4.

James Shaub, the CEO and former president of the company, admitted that unit managers have worked double shifts and even triple shifts, and that he himself had previously worked a double and a triple shift. (Docket Entry No. 278, Transcript at p. 80). Other of Defendants' witnesses testified that unit managers worked double shifts, but differed as to the frequency of such work. (Docket Entry No. 270, Transcript at pp. 256–57, 276–78, 323–24 and Docket Entry No. 278, Transcript at pp. 10–11, 33–34, 54–55, 80).

Some Plaintiffs occasionally worked triple shifts, i.e., 24 hours straight in the restaurants, but also they routinely napped or slept in the restaurant's offices during the slow business periods. Plaintiffs also were required to work on their days off and, in fact, most of their workweeks were six day workweeks rather than five day workweeks. Based upon the evidence, the Court finds that the Plaintiffs routinely worked between two to four double shifts per week.

With the double shifts and the occasional triple shifts, the Plaintiffs regularly worked an average of between 80 and 100 hours per week. (Docket Entry No. 277, Transcript at pp. 32, 100, 147, 246, 271) and (Docket Entry No. 276, Transcript at pp. 17, 107, 174, 199) (Parsons, 96 hours per week; Artley, 88 hours per week; Waterson, 85 hours per week; Lefever, 85 hours per week; Cooper, 100 hours per week; Harper, 90 hours per week; Dougherty, 87 hours per week; Solano, 90 hours per week; Morton, 85 hours per week; and Meza 86 hours per week). Based upon the evidence, the Court finds that the average number of hours worked by the Plaintiffs as unit managers is 89.04 hours per week. This finding is in accord with Judge Higgins' finding that "... the average number of hours [unit managers] worked per week while employed at Treetop ranged from 87.32 to 90.76." See Docket Entry No. 212, Memorandum at p. 6.

The Defendants dispute the unit managers' working these hours as a physical impossibility. Defendants' internal time records of Timothy Harper reflect that he worked as an hourly cook at one of Defendants' Waffle House restaurants. Harper substituted for his unit manager, but as an hourly employee at the time, Harper had

to record his work hours. *Id.* During that week, Harper recorded and submitted to Defendant 96.5 hours, representing a seven straight days as a unit manager. (Docket Entry No. 277, Transcript at pp. 313–314; Defendants' Exhibit 13a–g). The Defendant paid Harper for these hours without any question. Plaintiff Robert Parsons cited payroll prelist documents reflecting numerous examples of his multiple double shifts. *Id.* at pp. 71–80.

The only time records that reflect the exact number of hours worked were temporarily maintained by the Defendant's unit managers. Plaintiff Debra Dougherty explained that for a time, she made entries in the "redbook" on restaurant activities that showed that she worked 16 straight days without a day off. (Docket Entry No. 276, Transcript at pp. 89–91). Yet, Dougherty was told by the Defendant's higher management to cease calling in her work hours to the central office and logging her hours in the "redbook". *Id.* at pp. 17–21. According to Dougherty, some entries in the "redbook" were erased. *Id.* at p. 20–12.

To dispute the frequency of double shifts and the average number of hours worked per week, James Shaub cited the company's "28–Day Comparison Reports" that are compiled for the percentage of payroll costs to sales. (Defendants' Collective Exhibit No. 61(a) through (1)). These documents purportedly reflect that the restaurants at which some Plaintiffs worked were fully staffed during certain time periods. Yet, on cross-examination, Shaub conceded that these records did not necessarily reflect a fully staffed restaurant, because a cook could have been substituting for an absent server at cook's pay, or a server could have been filling in for an absent cook at cook's pay. Such instances, would have amounted to an insignificant payroll cost decrease. (Docket

Entry No. 278, Transcript at pp. 203–04, 205–07). Shaub also admitted that overtime costs resulting from understaffing could bring payroll costs up to a level that appeared from the records to indicate full staffing but, in fact, the restaurant was understaffed because the unit manager had to work a double shift. *Id.*, p. 203. These reports are also inconsistent with the Defendants' description of their actual business operations as reflected in Ezell's affidavit and Treetop's hotline policy. Accordingly, the Court finds that these costs reports are inaccurate and unreliable indicators of staffing and the unit managers actual work experiences at the Treetop restaurants.

Defendants also presented testimony from several present employees of Waffle House who worked as unit managers and who are not plaintiffs. These witnesses generally testified that they worked substantially fewer hours than the Plaintiffs. Yet, these witnesses admitted that they were aware of the practice of unit managers working double shifts, but insisted that double shifts were few. For instance, Earl Barbour testified that he talked on the telephone with Timothy Harper during third shift on several occasions when both he and Harper were working a double on the third shift. (Docket Entry No. 278, Transcript at p. 18–19). Barbour admitted that the unit manager job could take as many as 70 hours a week to perform even when no double shifts were worked. *Id.* at pp. 56–57. Barbour testified that his restaurant was fully staffed. (Docket Entry No. 278, Transcript at p. 17).

Other defense witnesses, such as Daniel Trujillo admitted that when he first came to work as unit manager at Waffle House, he worked double shifts three days straight, causing him to quit. (Docket Entry No. 276, Transcript at p. 277). Jeannine Dixon admitted that low staffing and

high turnover increased the likelihood of unit managers working double shifts, but testified that her store did not have these problems, but her restaurant also had slow sales. *Id.* at pp. 324–25. Sam Byrd admitted that he did not follow company policy at his restaurant as to staffing and work hours. (Docket Entry No. 278, Transcript at pp. 49–50, 50–51, 53–54). The Court concludes that these witness' experiences are not representative of Treetop unit managers' actual work experiences at Treetop's restaurants.

### B. Conclusions of Law

■ As to the FLSA provisions[2] on damages, where the employer fails to maintain employee time records in accordance with 29 U.S.C. § 211(c) and Plaintiffs prove actual work without proper compensation, an approximation of damages by the Court is appropriate once the fact of injury is proved. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 688, 66 S.Ct. 1187, 1192–93, 90 L.Ed. 1515 (1946). In such instances, the *employer* has the burden of disputing Plaintiffs' approximation and proving the precise amount of work performed when the employer's records are inaccurate or inadequate:

> In such a situation we hold that an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. *The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence.* If the employer fails to produce

such evidence, the court may then award damages to the employee, even though the result be only approximate ... *It is enough under these circumstances if there is a basis for a reasonable inference as to the extent of the damages.* (citations omitted)

328 U.S. at 687–88, 66 S.Ct. at 1192–93 (emphasis added).

This approach obtains even where an employer makes an innocent mistake in its compensation policies and practices:

> The employer cannot be heard to complain that the damages lack the exactness and precision of measurement that would be possible had he kept records in accordance with the requirements of section 11(c) of the Act. And even where the lack of accurate records grows out of a bona fide mistake as to whether certain activities or non-activities constitute work, the employer, having received the benefits of such work, cannot object to the payment for the work on the most accurate basis possible under the circumstances.

328 U.S. at 688, 66 S.Ct. at 1192–93. In *Mt. Clemens*, the testimony of 7 of 300 employees was sufficient to establish a FLSA damages award.

Applying *Mt. Clemens*, the Sixth Circuit in *Fegley v. Higgins*, 19 F.3d 1126, 1132, 1135 (6th Cir.1994), reversed a district court that refused to "extrapolate" an approximation of damages and remanded the action for determination of damages in accordance with *Mt. Clemens* standards. The Plaintiffs need not prove their damages with precision. *Id.* at 1133, n. 8 citing *Mt. Clemens* and *Hodgson v. American Concrete Construction Co.*, 471 F.2d 1183, 1186 (6th Cir.1973).

---

**2.** The Court relies upon and adopts Judge Higgins' earlier ruling on the merits of Plaintiffs' FLSA claims.

The Court concludes that the Plaintiffs have carried their burden of proof, but the Defendants have not carried their burden on the hours worked by the Plaintiffs each week in performing their actual duties as unit managers. From the testimony of the Plaintiffs' and the Defendants' employee records, the Court finds, as did Judge Higgins in his earlier ruling, that Plaintiffs worked an average of 89.04 hours per week and applying *Mt. Clemens,* this finding is applied to the entire Plaintiff class to determine the amount of overtime backpay owed for the number of weeks of work stipulated by the parties.

■ A separate issue is the calculation of overtime backpay. The FLSA provides that employees must be paid overtime for all hours worked over 40 during each workweek at a rate of one and one-half times their regular rate of pay. 29 U.S.C. Section 207(a). The Court has determined that the Plaintiffs must be paid for 49.02 hours of overtime during each week of employment. The Court, however, must now determine the regular rate and overtime rate to calculate the amount of the overtime backpay owed for each week of employment.

FLSA regulations on the regular rate of pay to determine the overtime rate for a salaried employee is set forth in 29 C.F.R. § 778.113, that provides:

(a) Weekly salary. If the employee is employed solely on a weekly salary basis, his regular hourly rate of pay, *on which time and a half must be paid,* is computed by dividing the salary by the *number of hours which the salary is intended to compensate.* If an employee is hired at a salary of $182.70 and if it is understood that this salary is compensation for a regular workweek of 35 hours, the employee's regular rate of pay is $182.70 divided by 35 hours,

or $5.22 an hour, and when he works overtime he is entitled to receive $5.22 for each of the first 40 hours and $7.83 (one and one-half times $5.22) for each hour thereafter. If an employee is hired at a salary of $220.80 for a 40–hour workweek, his regular rate is $5.52 an hour.

(emphasis added). Under this regulation, the regular rate is divided the weekly compensation by the number of hours the salary is intended to compensate, not necessarily the number of hours the employee actually works.

Where the employee has a fixed salary, in *Newmark v. Triangle Aluminum Industries, Inc.,* 277 F.Supp. 480 (N.D.Ga., 1967), the Court addressed the calculation of damages under 29 C.F.R. Section 778.109 and held that it is the agreed upon compensation that is the base salary amount. In *Newmark,* the Court rejected the employer's argument that total compensation received should be used to divide all hours worked to determine a regular rate and that half of that should then be multiplied by the overtime hours in order to determine overtime backpay. 277 F.Supp. at 481–82. The Court stated:

However, defendant has overlooked 29 C.F.R. § 778.113, on the next page, which in describing the method for computing the "regular rate" for salaried employees, reiterates that the "regular hourly rate is computed by dividing the salary by the number of hours which the salary is intended to compensate."

It is obvious that the phrase "hours actually worked," *the divisor sought by defendant, is not synonymous with "hours for which the agreed-upon salary is intended to be compensation." If the agreed-upon hours are less than those actually worked, the divisor would be smaller and the resulting "agreed rate per hour" would be correspondingly*

*larger.* What the agreed-upon hours were can only be established by proper evidence. If it develops that the Plaintiff did agree to work 40 hours a week, as admitted in paragraph 3 of defendant's original answer, and as alleged in the Affidavit of Emmanuel Gladstone submitted by the plaintiff, then 40 is the proper divisor for the purpose of establishing the regular rate of pay.

\*   \*   \*   \*   \*   \*

*... [I]f the contract was for a definite number of hours, other than 40, then the divisor for calculating the hourly rate is the hours set by the contract, as long as the resultant hourly wage does not fall below the statutory minimum.*

277 F.Supp. at 481–82 (emphasis added and citations omitted).

Thus, the Court concludes that the agreed-upon work hours for Plaintiffs' work as unit managers at Treetop controls on the number of hours that will be divided into the weekly compensation here to determine the employees' regular hourly rate of pay.

Based upon the evidence, the Court finds that the agreed upon hours for work as a unit manager when Plaintiffs became unit managers were 10 hours a day, six days on and two days off. The undisputed proof is that the Plaintiffs were expected to work 60 hours a week during six day weeks and 50 hours a week during five day weeks if they accepted the position. Defendants' internal and posted documents also reflect that the Defendants contemplated a 10 hours work day for their unit managers. See, Plaintiffs' Exhibit 1 and Plaintiffs' Exhibit 4.

To calculate the number of hours that the weekly compensation was intended to cover, the Court notes that the six days on and two days off work schedule would result in a mixture of six day and five day

workweeks throughout the calendar year based on the FLSA workweek standard. Specifically, during a 52–week period, the agreed upon schedule would result in 14 six-day weeks of 60 hours and 38 five-day weeks of 50 hours. By multiplying the 14 six-day weeks by 60 hours (840 hours) and the 38 five-day weeks by 50 hours (1,900 hours), adding the totals (2,740 hours), and dividing the total by 52 weeks, the agreed upon schedule results in an average workweek of 52.69 hours, or 53 hours.

Accordingly, the Court concludes that when the Plaintiffs were employed, they accepted a job to work an average of 53 hours per week as unit managers. Based on this agreed schedule, the Court finds that Plaintiffs' weekly compensation was intended to cover no more than 53 hours per week. Thus, the regular rate is determined by dividing the stipulated weekly compensation of $579 by 53 hours, yielding an hourly pay of $10.92 an hour. Plaintiffs have been paid their straight time compensation for up to 53 hours at a rate of $10.92 an hour.

The Court concludes that the Defendants owe one and one-half times the regular rate of pay, or $16.38, for all overtime hours over 53 (36.20 hours). Accordingly, the Court concludes that the Defendants owe additional overtime backpay of $592.95 per week (36.20 hours × $16.38) for the hours between 53 and 89.20, yielding a of $663.93 of overtime backpay owed to the Plaintiffs for each week of their employment. With the stipulated number of weeks of employment of 4,321 weeks, the Court concludes that the total overtime backpay owed by Defendant to Plaintiffs is $2,868,841.50.

■ Defendants urge the Court to apply the fluctuating workweek method under FLSA regulations in determining the overtime backpay owed to the Plaintiffs. This fluctuating workweek provision is set forth

in 29 C.F.R. Section 778.114, that provides, in pertinent part, as follows:

(a) An employee employed on a salaried basis may have hours of work which fluctuate from week to week and the salary may be paid him pursuant to an understanding with his employer that he will receive such fixed amount as straight time pay for whatever hours he is called upon to work in a workweek, whether few or many. *Where there is a clear mutual understanding of the parties that the fixed salary is compensation (apart from overtime premiums) for the hours worked each workweek, whatever their number, rather than for working 40 hours or some other fixed weekly work period, such a salary arrangement is permitted by the Act* if the amount of the salary is sufficient to provide compensation to the employee at a rate of not less than the applicable minimum wage for every hour worked in those workweeks in which the number of hours he works is greatest, *and if he receives extra compensation, in addition to such salary, for all overtime hours worked at a rate of not less than one-half his regular rate of pay.* Since the salary in such a situation is intended to compensate the employee at straight time rates for whatever hours are worked in the workweek, the regular rate of the employee will vary from week to week and is determined by dividing the number of hours worked in a workweek into the amount of his salary to obtain the applicable hourly rate for the week. Payment for overtime hours at one-half such rate in addition to the salary satisfies the overtime pay requirement because such hours have already been compensated at the straight time regular rate, under the salary arrangement.

29 C.F.R. Section 778.114(a) (emphasis added).

Defendants contend that Plaintiffs' regular rate should be determined by dividing the stipulated weekly compensation of $579 by the total number of hours worked each week rather than the agreed upon schedule of 53 hours. Defendants also argue that the Plaintiffs should be considered to have received straight time for all hours worked, and are only entitled to half-time for all of the hours worked over 40 during each workweek.

Yet, the Defendants have not presented the necessary evidence to avail themselves of Section 778.114. Under this Section, there must be "... *a clear mutual understanding* of the parties that the fixed salary is compensation (apart from overtime premiums) for the hours worked each workweek, whatever their number, rather than for working 40 hours or some other fixed weekly work period ..." (emphasis added). Defendants have not presented evidence that there was a "clear mutual understanding" by the parties that their compensation was intended to cover whatever hours they worked rather than some other fixed weekly work period. The evidence reflects that the weekly compensation was intended to cover the 53 hour workweek represented by the 10 hour a day, six day on and two day off work schedule. The preponderance of the evidence shows an agreed 10–hour a day work schedule as described by Plaintiffs' testimony and Defendants' internal documents.

In *Dingwall v. Friedman Fisher Associates,* 3 F.Supp.2d 215 (N.D.N.Y.1998), the defendant misclassified the plaintiff as an exempt professional. To calculate the overtime backpay to plaintiff, who was on salary, the defendant argued that the fluc-

tuating workweek provisions of 29 C.F.R. Section 778.114 should apply. The Court declined explaining:

This method is an exception to the normal rights of the employee and thus the employer bears the burden of proving that all the requirements for applying the method are present. See *Burgess v. Catawba County,* 805 F.Supp. 341, 348 (W.D.N.C.1992). Critically, an employer must demonstrate that the employer and the employee had a clear, mutual understanding that the employer will pay the employee the fixed weekly salary regardless of the hours worked. *Roy v. County or Lexington, S.C.,* 141 F.3d 533, 547 (4th Cir.1998). Here, defendant has failed to establish this requirement. There is no evidence in the record that plaintiff clearly understood that his salary was intended to compensate him for any hours worked. To the contrary, the employee manuals distributed at various times during plaintiff's employment all state that "staff personnel are normally expected to work a 40 hour week with the exception of preestablished holidays." ... Thus, the fluctuating workweek method is inapplicable.

3 F.Supp.2d at 221. The Court determined the regular rate by dividing the weekly salary by 40 hours, calculating the one and one-half times the regular rate for overtime pay. *Id. Accord Troutt v. Stavola Brothers, Inc.,* 905 F.Supp. 295, 300 (M.D.N.C.1995), *aff'd,* 107 F.3d 1104 (4th Cir.1997) (Section 778.114 inapplicable because "Defendant has failed to establish that there was any 'clear mutual understanding' regarding fluctuating hours.").

■ Although Defendants cited a number of cases in support of their position, these decisions are factually distinguishable given the substantial evidence from both sides of the agreed schedule of hours at the outset of employment. Moreover, to comply 29 C.F.R. Section 778.114 requires a *contemporaneous* payment of the half-time premium for an employer to avail itself of the fluctuating workweek provision. *Rainey v. American Forest and Paper Association,* 26 F.Supp.2d 82 (D.D.C. 1998). In *Rainey,* the Honorable Louis F. Oberdorfer, District Judge, held that Section 778.114 does not contemplate any employer who avails itself of its provisions in response to a FLSA action for backpay:

*Since contemporaneous payment of overtime compensation is a necessary prerequisite for application of the fluctuating workweek method, as a matter of law defendant has failed to prove that "all the legal prerequisites for use of the 'fluctuating workweek method of overtime payment are present.'"* (citations omitted).

\*   \*   \*   \*   \*   \*

*Defendant attempts to avoid this conclusion by suggesting implicitly that the overtime payment criterion is satisfied if overtime is awarded as a remedial measure.* In other words, *it argues that even if no overtime was paid contemporaneous to the disputed events, the fluctuating workweek method can still be used, as a matter of law, so long as overtime is paid retroactively. Defendant's interpretation runs counter to the plain meaning of the DOL regulations.* Specifically, 29 C.F.R. Section 778.114 makes clear that the fluctuating workweek method can be used only if the employee "receives extra compensation, in addition to [the fixed] salary, for all overtime hours worked at a rate of not less than one-half his regular rate of pay." 29 C.F.R. Section 778.114(a). This provision contains no suggestion that such compensation need only be paid as part of a judicially crafted remedy, but rather establishes that it is a

necessary precondition to application of the fluctuating workweek method.

26 F.Supp.2d at 101 (emphasis added).

To be sure, in *Blackmon v. Brookshire Grocery Co.*, 835 F.2d 1135 (5th Cir.1988), the Fifth Circuit applied Section 778.114(a) retroactively, but this Court agrees with *Rainey* that the Defendants' prior assertion of exempt status for these employees and the lack of contemporaneous payment of the 50% overtime to unit managers bar the Defendants' reliance upon Section 778.114(a).

> *The structural framework of the Act and the DOL regulations undercuts defendant's claim that it had a "clear mutual understanding" with plaintiff. Defendant has maintained consistently that ... plaintiff was employed in an administrative capacity that rendered her exempt from section 207(a) of the Act. If plaintiff were in fact exempt, she clearly would not have been entitled to any overtime compensation, no matter how computed, as the provisions for overtime compensation apply only to employees not exempt from section 207(a).* Yet defendant insists that all along it had a clear mutual understanding with plaintiff, one defined by the regulations as encompassing an understanding that overtime premiums would be paid. See 29 C.F.R. section 778.114(a) ("a clear mutual understanding ... that the fixed salary is compensation (apart from overtime premiums) for the hours worked each workweek..") *Defendant cannot credibly argue both sides of the same coin.*

> *If defendant believed that plaintiff was exempt from section 207(a), such that she was entitled to no overtime compensation, then it was not possible for it to have had a clear mutual understanding with plaintiff that she was subject to calculation method applicable only to non-exempt employees who are entitled to overtime compensation.*

> \* \* \* \* \* \*

> ... overtime compensation is to be awarded according to the one and one-half time rate set forth in section 207(a) of the Act.

26 F.Supp.2d at 101–02 (emphasis added).

The Fourth and Seventh Circuits have applied Section 778.114(a) where the employee at issue had been previously paid for overtime at fifty percent of his hourly rate. See *Griffin v. Wake County*, 142 F.3d 712, 714–15 (4th Cir.1998); *Condo v. Sysco Corp.*, 1 F.3d 599, 600, 605 (7th Cir.1993).

The Defendants also argue that it was a physical impossibility for the Plaintiffs to have worked the hours claimed here, namely 87 to 90 hours per week. The Court notes that in *Hall v. Cocke County, Tn.*, 940 F.2d 660, 1991 WL 151019 (6th Cir.1991), a District Court and the Sixth Circuit both considered as a viable FLSA claim, an employee who worked 15 hours per day (75 hours per week) but "was also required to· be on the premises for forty-eight hours during the weekend, i.e., all day Saturday and Sunday." *Id.* at \*1. These figures would total 123 hours per week. See also, *Spencer v. Viking Yarn Mills*, 101 F.Supp. 749, 750 (E.D.Pa.1951) (where Court found that plaintiff worked an eighty-four hour shift for weeks). Of course, the employment records for the Plaintiff Harper, reflect a ninety-six and one half hour work week. See Defendants' Exhibits A–G.

In sum, the Court concludes that the Defendants cannot avail themselves of Section 778.114. Accordingly, a judgment for overtime ·backpay is hereby rendered in favor of Plaintiffs against Defendants Treetop Enterprises, Inc. and Billy Ezell in the amount of $2,868,841.50.

As to prejudgment interest, the Sixth Circuit has held that if liquidated damages under FLSA are not awarded, then prejudgment interest must be awarded on backpay from the date the claims accrued. *McClanahan v. Mathews,* 440 F.2d 320, 326 (6th Cir.1971) ("... On remand if the District Court ... remains of the belief that liquidated damages are wholly inappropriate, then it must award interest on back pay from the date the claims accrued.").

The Court hereby awards the Plaintiffs prejudgment interest on their backpay awards from two years before the filing of this action through the date of entry of this judgment at the rate set forth in the pre-judgment interest statute, 28 U.S.C. § 1961, in effect at the time that the claims accrued. The plaintiffs are also awarded post-judgment interest from the date of entry of this judgment forward on both the compensatory damages and pre-judgment interest at the statutory rate, 28 U.S.C. § 1961, in effect at the time of entry of the judgment. The parties are directed to submit proposed calculations of pre-judgment interest to the Court within 20 days of the entry of this judgment.

Pursuant to 29 U.S.C. Section 216(b), Plaintiffs are also hereby awarded their attorney's fees that shall be submitted in accordance with Local Rule 13(e) by September 4, 2001 and the Defendants' response shall be filed by September 17, 2001.